# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | |
| MORDCHAI FISH, a/k/a "Mordechai Fisch," a/k/a "Martin Fisch," LAVEL SCHWARTZ, a/k/a "Albert Schwartz," ABRAHAM POLLACK and NAFTOLY WEBER | : : | Mag. No. 09-3615 |

I, Robert J. Cooke, being duly sworn, state the following is true and correct to the best of my knowledge and belief.

From in or about February 2009 to in or about July 2009, in Monmouth County, in the District of New Jersey, and elsewhere, defendants MORDCHAI FISH, a/k/a "Mordechai Fisch," a/k/a "Martin Fisch," LAVEL SCHWARTZ, a/k/a "Albert Schwartz," ABRAHAM POLLACK, NAFTOLY WEBER and others did:

> knowingly and willfully conspire to conduct and attempt to conduct financial transactions involving property represented to be the proceeds of specified unlawful activity, specifically, trafficking in counterfeit goods, with the intent to conceal and disguise the nature, location, source, ownership, and control of the property believed to be proceeds of specified unlawful activity, contrary to Title 18, United States Code, Section 1956(a)(3).

In violation of Title 18, United States Code, Section 1956(h).

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts:

SEE ATTACHMENT A

continued on the attached page and made a part hereof.

*Robert J. Cooke*
Robert J. Cooke, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 21, 2009, at Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

<u>Attachment A</u>

I, Robert J. Cooke, am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have personally participated in this investigation and am aware of the facts contained herein, based upon my own participation in this investigation, as well as information provided to me by other law enforcement officers. Because this Attachment A is submitted for the limited purpose of establishing probable cause, I have not included herein the details of every aspect of this investigation. Statements attributable to individuals contained in this Attachment are related in substance and in part, except where otherwise indicated. All contacts discussed herein were recorded, except as otherwise indicated.

1. Defendant Mordchai Fish, a/k/a "Mordechai Fisch," a/k/a "Martin Fisch," ("defendant FISH"), a resident of Brooklyn, New York, served as a rabbi at Congregation Sheves Achim, a synagogue located in Brooklyn. Defendant FISH operated several charitable tax-exempt organizations in conjunction with his synagogue, including one called BGC. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant FISH does not hold a license to transmit or remit money.

2. Defendant Lavel Schwartz, a/k/a "Albert Schwartz," ("defendant SCHWARTZ"), a resident of Brooklyn, was the brother of defendant FISH, and also served as a rabbi. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant SCHWARTZ does not hold a license to transmit or remit money.

3. Defendant Abraham Pollack ("defendant POLLACK") was a resident of Brooklyn. Defendant POLLACK operated a vending business. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant POLLACK does not hold a license to transmit or remit money.

4. Defendant Naftoly Weber ("defendant WEBER") was a resident of Brooklyn. Defendant WEBER operated an elevator installation and repair business. A check with the New Jersey Department of Banking and Insurance and the New York State Department of Banking has revealed that defendant WEBER does not hold a license to transmit or remit money.

1

5. At all times relevant to this Complaint, there was a cooperating witness (the "CW") who had been charged in a federal criminal complaint with bank fraud in or about May 2006. Pursuant to the FBI's investigation and under its direction, the CW from time to time represented that the CW purportedly was engaged in illegal businesses and schemes including bank fraud, trafficking in counterfeit goods and concealing assets and monies in connection with bankruptcy proceedings.

6. On or about February 5, 2009, the CW received an interstate telephone call in New Jersey from defendant FISH in New York, during which defendant FISH and the CW discussed "gemoras"--a code word used by defendant FISH to refer to cash. Defendant FISH was informed by the CW that "I have some . . . gemoras or whatever, you know." The CW further told defendant FISH that the CW had "[m]aybe 25 or something," a reference to $25,000 in cash. Defendant FISH replied "[i]s that all? That's all?" In response, the CW stated "[y]eah, I think. Maybe, uh, more. But so far that's what I have." The CW then asked defendant FISH "get me the, you know, the name for the gemora, and then I'll take care of it." Defendant FISH then asked "when do you want to learn," a coded reference to when the money laundering transaction would occur. The CW replied "Tuesday's fine." At the conclusion of the conversation, the CW asked defendant FISH to "[l]et me know--Sunday, Monday, the name of the gemora," in order to find out to what organization or individual the CW should make out the $25,000 bank check. Defendant FISH agreed to let the CW know.

7. On or about February 9, 2009, the CW placed an outgoing interstate telephone call from New Jersey to defendant FISH in New York. The CW asked defendant FISH "you got that name for those gemoras?" Defendant FISH replied "[y]es," and told the CW to make the check payable to BGC, a charitable organization operated by defendant FISH. The CW then asked "[s]o tomorrow morning is good to learn, right?" Defendant FISH answered in the affirmative, and the CW and defendant FISH agreed to meet at 10 a.m. The CW then confirmed that "we'll do it with 25 gemoras," prompting defendant FISH to reply "[o]kay, fine, fine."

8. On or about February 10, 2009, the CW met with defendants FISH and SCHWARTZ to consummate a money laundering transaction. Upon meeting defendants FISH and SCHWARTZ at a residence on Hooper Street in Brooklyn, the CW provided defendant FISH with a $25,000 bank check drawn upon a bank in Monmouth County, New Jersey, made payable to BGC, per defendant FISH's instructions. The CW indicated to defendant FISH that the check represented profits from the CW's "bag business" in which they

2

switched "the labels," and told defendant FISH that the money from that business was directed "offshore and then comes back in." During the conversation, defendant SCHWARTZ warned the CW to be careful about talking over the telephone, prompting the CW to assure defendant SCHWARTZ that "I had the lines checked. They swept, they swept all the lines. There's nothing on them . . . . They're clean." Defendant FISH then indicated that he and the CW would travel to a location on 8th Street in Brooklyn to pick up the cash to complete the money laundering transaction. Upon arrival at the address on 8th Street, defendant FISH led the CW through a corridor to an office near the back of the building. Within this office were defendants WEBER and POLLACK, the latter of whom informed the CW that he operated a vending business. While in the presence of the CW and defendant WEBER, defendant POLLACK accessed a safe in a cabinet in the back of the office. Defendant POLLACK provided defendant FISH with a large sum of cash, and defendant FISH appeared to count through the cash. Defendant FISH also provided defendant POLLACK with the CW's bank check for $25,000.

9. After departing the premises, defendant FISH and the CW returned to the Hooper Street residence where they were joined by defendant SCHWARTZ. The three then counted the cash provided by defendant POLLACK which totaled approximately $24,375. Of this total, the CW was provided with $22,500, thus reflecting that the CW had paid a ten percent fee for the transaction. In addition, defendant POLLACK retained $625 from the transaction, thus indicating that defendant POLLACK was compensated at a rate of return of approximately 2.5 percent.

10. On or about February 26, 2009, the CW met with defendants FISH and SCHWARTZ at the same Hooper Street residence in Brooklyn to consummate another money laundering transaction. Initially, the CW provided defendant FISH with a $100,000 bank check drawn upon an account at a Monmouth County bank, made payable to BGC, the same charitable organization to which the bank check had been made out to on February 10, 2009 per defendant FISH's instructions. Defendant SCHWARTZ and the CW discussed the impending money laundering transaction, and defendant SCHWARTZ warned the CW that "[y]ou have to be careful," and added, "[i]t's better they don't know you," a reference to the individuals with whom they would be meeting shortly. Defendant SCHWARTZ also inquired about the CW's purported counterfeit merchandise business prompting the CW to reply that "[w]ith the counterfeit bags, you know, we make the fake bags . . . It's better because people -- the economy is down." The CW explained that "I switch the label," and stated that "I make them for fifty dollars . . . I sell them for two hundred dollars

3

each." When defendant SCHWARTZ inquired whether the legitimate manufacturers were aware of the CW's business, the CW replied that "[t]hey'd put me out of business. You can't do that. It's not legal." The CW also told defendant SCHWARTZ that "[t]his hundred thousand dollar check. It's just the profits . . . They give me profits every week." After defendant FISH joined defendant SCHWARTZ and the CW, defendant FISH explained that the next money laundering transaction which was planned for the following week would take place in Boro Park, and explained that the "Israeli guy" had $300,000 in cash available. However, defendant FISH cautioned that "[w]e have to be very careful how we talk. Very, very careful."

11. Defendant FISH and the CW then proceeded to the address on 8th Street in Brooklyn and entered the same office that they had visited approximately two weeks earlier. Upon entering the office, defendant POLLACK provided the CW with several bundles of cash, consisting primarily of $100 bills. As defendants POLLACK and FISH talked, the CW ran the cash through a cash-counting machine positioned along a wall near defendant POLLACK's desk. The CW counted out $90,000 in denominations of $100 and $50, and defendant POLLACK supplied the CW with a bag in which to hold the cash. Defendant WEBER then entered the office and discussed his elevator business with the CW. The CW subsequently informed defendant POLLACK that the CW had just picked up the $100,000 bank check in New Jersey, and asked defendant POLLACK "if we want to do more business, you have more like this next week, or no more?" Defendant POLLACK replied that the CW would have to speak with another individual, whom it is believed, supplied the cash to defendant POLLACK. The CW informed defendant POLLACK that the money from the check had been generated from the CW's "bag business," from which "[w]e have a lot of profits." Defendant POLLACK then supplied the CW with the phone number of the individual whom he indicated that the CW should contact to arrange further deals. As defendant FISH and the CW departed, defendant FISH scolded the CW for saying too much, and explained that "[t]he money, I'm not doing with [the other individual] everything. I'm doing with Israel. Because why? I don't want to put everything in one pot." When the CW inquired whether defendant FISH intended to forego using defendant POLLACK for future deals, defendant FISH replied "[h]e's just a middle man. We're using the other guy."

12. On or about July 7, 2009, the CW met with defendants POLLACK and WEBER at the office on 8th Street in Brooklyn. Defendant WEBER and the CW first discussed defendant WEBER's elevator installation and repair business, after which the CW informed defendant WEBER that "I got, um, [a] pocketbook

4

business." The CW further purported that "[w]e make like, uh, knock-off bags, you know, like, you know, Gucci, Prada, whatever. It costs us twenty, thirty dollars. We sell 'em for sixty, seventy dollars to retailers. The same one your wife goes, buys for two thousand dollars." The CW also informed defendant WEBER that "once in a while I have profits from there. That's why I exchange the checks, I gave you money, just like I did with you guys." The CW then asked defendant WEBER "if I need money on like the week of the 20th, I gotta call what's-his-name David, or I could call you or him?" In response, defendant WEBER pointed in the direction of defendant POLLACK's desk, and offered to provide the CW with defendant POLLACK's cell phone number. A short while later, defendant POLLACK reentered the office and began to talk with the CW. The CW informed defendant POLLACK that "I got a, uh, bag business. We make pocketbooks. You know, bot--, you know, like, just the same ones, like, you know, knock-off Gucci, Prada and stuff, uh, like that in New Jersey. We make 'em for twenty, thirty dollars, sell 'em for fifty, sixty, seventy dollars. You know, in regular stores, they charge two thousand. Ours, ours look better, but, uh, it's not the real thing." The CW also purported to defendant POLLACK that "I got profits from there, just like, you know, I got, I got money last time. The week of the 20th, I'm not--, I might need a couple hundred thousand." The CW then inquired whether the CW could arrange such a transaction directly with defendant POLLACK or whether the CW would need to contact the individual to whom defendant POLLACK had directed the CW on February 26, 2009. Having overheard this question, defendant WEBER then interjected "[n]o, you can call him directly," a reference to defendant POLLACK. Defendant POLLACK confirmed that "[y]ou can call me." The CW next inquired of defendant POLLACK "[h]ow much time do you need," prompting defendant WEBER to ask "[y]ou need checks, and you have the cash?" In reply, the CW explained that "[n]o, no, I have profits from my--I have checks. Bank check, I'll bring you." Defendant POLLACK inquired, by way of clarification, "[y]ou bring me bank checks?" The CW replied "[y]eah, and I need the money," and asked, referring to a charitable organization, "[w]ho do I make it out to? To, to the gemach or something?" The CW then added "I don't need a write-off, you understand? . . . Uh, it doesn't mean anything to me, the write-off." Upon hearing this, defendant WEBER asked "[y]ou spoke to my father, no?" Defendant WEBER then asked "[s]o who do you write the checks from?" The CW replied that "I'll bring you a bank check." Defendant WEBER explained to the CW that "my father charges 8 percent," and added "in other words, if you bring a check for a, a, a, a hundred thousand dollars . . ." The CW interjected "[i]f I bring, let's say, three hundred thousand," prompting defendant WEBER to reply "[t]hree hundred thousand. You bring a check for

5

three hundred thousand dollars, my father would charge you--he'll give you the cash. My father would charge 8 percent. It would be eight thousand dollars a [u/I]." The CW noted "[y]eah, I understand. Twenty-four grand," to which defendant WEBER replied "[r]ight." Defendant WEBER and the CW then discussed to what payee the CW should make out any bank checks that the CW would bring, and defendant WEBER noted that "we have different names." The CW then stated "[s]o give me the names." The CW also asked whether the CW should make out multiple checks, each for "a hundred thousand," prompting defendant WEBER to reply "[y]es." The CW next inquired whether defendant WEBER's father was "the guy in charge" of the money laundering operation, and defendant WEBER stated "my father is, yeah." The CW asked "[h]ow many days notice" would be needed to arrange for a three hundred thousand dollar transaction, prompting defendant WEBER to reply "[a] week." Defendant POLLACK also stated "[g]ive me a week." The CW then asked, by way of clarification, "I'll bring you the checks. You'll give the money, no problem, right?" Defendant POLLACK replied "[y]es, without a problem." Defendant POLLACK provided the CW with a list of five names to which the CW could make out the bank checks as part of the laundering transaction. The CW also asked if they could conduct a transaction the following week for "a smaller amount--fifty or a hundred thousand," prompting defendant POLLACK to reply "[n]ot a problem." Before departing, the CW indicated that the CW would contact defendant POLLACK on POLLACK's cell phone to arrange this deal, and defendant POLLACK agreed to inform the CW to whom the CW should make the bank check payable.

      13. Between in or about February 2009 and in or about July 2009, defendants FISH, SCHWARTZ, POLLACK and WEBER engaged in money laundering transactions with the CW totaling approximately $125,000 in funds represented by the CW to involve the proceeds of criminal activities.